UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

UNITED STATES OF AMERICA, )
Government, )
)
vs. ) Cause No. 2:25-CR-45
NICHOLAS JADE HERMANN, )
Defendant. )

---

SENTENCING HEARING
BEFORE THE HONORABLE MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

JUNE 23, 2026
AMARILLO, TEXAS

---

A P P E A R A N C E S

<u>FOR THE GOVERNMENT</u>:
UNITED STATES ATTORNEY'S OFFICE
500 SOUTH TAYLOR STREET, SUITE 300
AMARILLO, TEXAS 79101
BY: MS. CALANDRA WOOLAM

<u>FOR THE DEFENDANT</u>:
FEDERAL PUBLIC DEFENDER'S OFFICE
600 SOUTH TYLER STREET, SUITE 2300
AMARILLO, TEXAS 79101
BY: MR. DAVID SLOAN

FEDERAL OFFICIAL COURT REPORTER:
CHRISTINE M. ORR
205 SE 5TH AVENUE
AMARILLO, TEXAS, 79101
(806)468-3816

PROCEEDINGS RECORDED BY STENOGRAPHY; TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

# INDEX


**PROCEEDINGS** **PAGE**

DEFENDANT'S MOTION FOR DOWNWARD VARIANCE
COURT'S TENTATIVE DETERMINATION........ 4

* * * * * * *

**VICTIM IMPACT STATEMENT**
BY BRITNEY KEMP STONE......... 48

* * * * * * *

**CHARACTER STATEMENTS ON BEHALF OF DEFENDANT**
JOHN OSCAR JOHNSON..................... 55
KIRSTAN R. HERMANN..................... 60

**SENTENCING EVIDENCE/ARGUMENT**
ON BEHALF OF THE GOVERNMENT............ 63
ON BEHALF OF THE DEFENDANT............. 68
DEFENDANT'S ALLOCUTION................. 72

**IMPOSITION OF SENTENCE**
COURT'S STATEMENT OF SENTENCE.......... 75
COURT'S STATEMENT OF REASONS........... 87

* * * * * * *

ADVISEMENT OF RIGHT TO APPEAL.......... 94
REPORTER'S CERTIFICATE................. 103


* * * * * * *

[CALL TO THE ORDER OF THE COURT.]

THE COURT: The Court calls criminal action number 2:25-CR-00045-Z-BR-1, *United States of America versus Nicholas Jade Hermann*, for sentencing. Are the parties ready to proceed?

MS. WOOLAM: Yes, your Honor. Callie Woolam on behalf of the United States, ready to proceed.

MR. SLOAN: David Sloan present with Nicholas Hermann. We're present and ready, Judge.

THE COURT: Counsel for the United States is present. Counsel for the Defendant is present.

Mr. Hermann, please acknowledge your presence in court today by stating your full name for the record.

THE DEFENDANT: Nicholas Jade Hermann.

THE COURT: And from this point forward, Mr. Hermann, you may participate in the hearing seated or standing, whatever is most comfortable and consistent with the advice of counsel. Before we proceed with sentencing, I will make a -- an announcement of my tentative determination on the pending Motion for Downward Variance. The Court has reviewed that Motion for Downward Variance in document number 55. Based on the information

contained in the PSR and the addendum as well as the Government's response in document number 58, the Court has tentatively determined that a non-guidelines downward variance to a below guideline sentence is sufficient pursuant to the factors set forth at Section 3553(a). The Court made this announcement of its tentative determination to afford the parties an adequate opportunity to prepare responsive arguments. The time for those arguments will be after the Court correctly calculates and announces the advisory guidelines range which must serve as our starting point before adjudicating any motions for variance. But at this time, the Court is tentatively inclined to grant that motion in part, and the parties should prepare accordingly.

Mr. Hermann, you appeared before United States Magistrate Judge Lee Ann Reno on February 2nd, 2026. At that time, you entered a plea of guilty to Count I of the Indictment, charging you with Enticement of a Minor, in violation of 18 U.S.C. Section 2422(b). On that date, the magistrate found that your guilty plea was knowledgeable and voluntary and supported by an independent basis in fact, containing each of the

essential elements of that offense. You told her that you understood the elements of that offense. You agreed to the accuracy of the factual resume. And you admitted that you committed all essential elements of the offense.

Accordingly, on February 20, 2026, this Court entered an order accepting your plea and adjudging you guilty of the crime alleged in the Indictment. This plea of guilty was entered pursuant to a written plea agreement, a written factual resume and a written plea agreement supplement.

Pursuant to Section 6B1.2(a) and Rule 11(c)(1)(A), this Court has separately reviewed your plea agreement, factual resume, Indictment, and the undisputed facts in the PSR and thereby determined that the remaining charge does adequately reflect the seriousness of your actual offense behavior. So that this Court's acceptance of your plea agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines. All relevant conduct having been taken into account in calculating your total offense level. For all those reasons and consistent with Rule 11(c)(4), this Court accepts your plea agreement and judgment and

sentence will be consistent with your plea agreement.

Now, Ms. Woolam, did the Government receive a timely copy of that presentence report?

MS. WOOLAM: Yes, your Honor.

THE COURT: Other than the Government's timely and written responses in documents 49, 51, 53 and 56, does the Government have any additional information responsive to the PSR or addenda?

MS. WOOLAM: No, your Honor.

THE COURT: And with those addenda now in place, does the Government adopt the facts and conclusions set forth in the PSR as modified by the addenda?

MS. WOOLAM: Yes, your Honor.

THE COURT: And Mr. Sloan, did you and your client receive timely copies of the PSR and addenda?

MR. SLOAN: We did, your Honor.

THE COURT: And did you have a full and complete opportunity to review the PSR and addenda with your client?

MR. SLOAN: We did, your Honor.

THE COURT: And did you explain to your client how the PSR and addenda work in this

sentencing process?

MR. SLOAN: Yes, your Honor.

THE COURT: Are you confident that your client fully understands the PSR and addenda?

MR. SLOAN: He does, your Honor.

THE COURT: Here, Defendant timely filed six objections to the PSR in document number 50. Objections three through six requested factual clarifications. And the Court discerns that objections number five and six which relate to PSR paragraphs 51 and 61 were accepted by the probation officer and are arguably mooted by that addendum. So let's take those up first.

Do you agree, Mr. Sloan, that the probation officer adequately addressed your factual clarification request and that objections five and six are mooted?

MR. SLOAN: Yes, your Honor.

THE COURT: And does the Government agree that objections five and six were addressed by the addendum and are now moot?

MS. WOOLAM: Yes, your Honor.

THE COURT: The Court agrees with counsel both for the Defendant and the Government that objections number five and six are now moot, as

reflected in the addendum that followed.

So let's turn on the remaining -- let's turn to the remaining timely filed objections, beginning with objection number three. So here, Defendant objected to paragraph 17's description of the Defendant deleting text messages. Defendant claims he did not delete text messages. However, the PSR generally bears sufficient indicia of reliability absent rebuttal evidence presented by the Defendant. Here, the Court is guided by *United States versus Rudolph*, 103 F.4th 356, a Fifth Circuit case recently decided in 2024. Applied here, PSR paragraph 17 states that officers observed Defendant deleting text messages while sitting in his vehicle, and Defendant marshaled zero rebuttal evidence to the contrary. For that reason and consistent with the *Rudolph* requirements, the Court overrules Defendant's objection number three because the information was received from otherwise reliable sources. And Defendant's objections are insufficient to overcome the general rule that information contained in the PSR bear sufficient indicia of reliability.

MR. SLOAN: And, your Honor, if I could -- if I could note briefly in response to your ruling

on paragraph 17, I did indicate in that paragraph that Mr. Hermann aversed his observations that he was not deleting items from his phone and he was holding up the phone so the officers could see what he was doing on the phone. And I would -- my position is that that is rebuttal evidence. The Court may not find it sufficient to rebut what the officers claimed, but it is our position that that does not amount to zero rebuttal evidence.

THE COURT: Okay. A response from the Government?

MS. WOOLAM: Your Honor, I believe that's just a proffer that he's making. I don't think that's evidence. His client did not testify about that. He's not taking the stand to testify about that now. Nonetheless, that doesn't seem like it would be sufficient evidence to rebut the proposition and the statements that are reflected in the presentence report, and we would say it should remain as written.

THE COURT: Okay. And Mr. Sloan, do you intend to present any witnesses or the Defendant himself?

MR. SLOAN: No, your Honor.

THE COURT: Okay. So here, the Court does

credit defense counsel with marshaling objections and assertions, and that is as close as he came to rebuttal evidence. But whatever the weight attributable to that rebuttal evidence, the Court finds that it's not sufficient to overcome the general rule and the standards under *Rudolph* to offset that general rule that the PSR does generally bear sufficient indicia of reliability. Here, that set of objections, specifically objection number three to PSR paragraph 17, was limited to the following: In paragraph 17, it indicated Mr. Hermann was observed to be deleting messages in his phone. Mr. Hermann wavers, w-a-v-e-r-s -- I'm sure that's a mistyped --

MR. SLOAN: Avers, your Honor.

THE COURT: -- version of the word avers. Okay. Mr. Hermann avers when he was in the vehicle making phone calls, he was specifically instructed by the investigators waiting outside of the vehicle not to delete anything and to hold his phone up so the investigators could see what he was doing and see that he was not deleting anything. He didn't -- he did hold his phone as instructed and did not delete anything. Here, the Court finds that this is not adequate or sufficient rebuttal evidence to

overcome the presumption that is included in PSR paragraph 17. And here, the Court weighted Defendant's objection and the Government's response against *Rudolph* and other Fifth Circuit precedent explaining that mere objections do not suffice as competent rebuttal evidence. Here, objection number three is in the form of a mere objection. And counsel can refer to *Solis*, a Fifth Circuit case from 2002, 299 F.3d 420. So Defendant's objection number three is overruled.

Objection number four. So in objection number four, Defendant objected to a description of Defendant's statements during a self-described, quote, mental health episode. And this relates to PSR paragraph 38. Again, the facts in the PSR generally bear sufficient indicia of reliability absent rebuttal evidence. Again, the Court is relying on the *Rudolph* opinion from 2024. Here, again, Defendant presents no evidence rebutting the information in PSR paragraph 38 but merely avers that this paragraph should be, quote, placed in proper context. The Court overrules Defendant's objection number four because the information was received from otherwise reliable sources, and Defendant's objections are insufficient to overcome

the general rule that information contained in the PSR bear sufficient indicia of reliability to be considered by a sentencing court. And again, counsel can refer to the *Solis* opinion, 299 F.3d 420, where the Fifth Circuit explains that mere objections do not suffice as competent rebuttal evidence. That said, the Court agrees with defense counsel that Defendant's statements in PSR paragraphs 38 and 39 were uttered during a self-described mental health episode and that Defendant recanted and denied the substance of those statements when he regained lucidity. Most relevant here, that he was talking to two unrelated students or otherwise involved in, quote, an inappropriate relationship. The Court at all times properly contextualized the statements in PSR paragraphs 38 and 39 and does agree with defense counsel that they should be weighted against the mental health episode that Defendant asserts in his objections and that is reflected also in the PSR. The PSR specifically states that those statements are not part of relevant conduct, that they are not tantamount to anything like an admission by Defendant, and this Court applied zero aggravating weight to the Court's weighting of the 3553(a) factors because of the

mental health episode. So although this Court is overruling Defendant's objection number four because it was unaccompanied by rebuttal information contemplated in *Rudolph*, the Court at all times properly contextualized the statements as nonadmissions stated during a mental health episode undeserving of 3553(a) sentencing weight.

Does Defendant have any additional information responsive to that tentative determination?

MR. SLOAN: No, your Honor.

THE COURT: Does the Government?

MS. WOOLAM: No, your Honor.

THE COURT: So that is the final -- the Court adopts its tentative determination as its final ruling and finding and thereby overrules Defendant's objection number four. But as articulated at the sentencing hearing, the Court gave no weight to statements which were uttered during the course of a mental health episode, and specifically, the Court did not consider it relevant conduct or anything tantamount to an admission, and the Court applied zero aggravating weight to those statements when it balanced the 3553(a) factors that apply at sentencing.

Okay. So now, I think we turn to the most substantive objections; number one and number two. And as we've always done at sentencing hearings in this Court, I'll announce my tentative determination and then invite responsive argument if it is not cumulative of the written papers.

So here, the Court has considered the -- considering the timely filed objections number one and two set forth in documents number 50 and number 54. Those will be considered alongside the Government's written responses in documents number 51 and 56 and the addendum that followed. Objection number one relates to care, custody or supervisory control of a minor as that enhancement appears in the Guidelines Manual and as applied here. Defendant's number -- first, let me confirm.

Mr. Sloan, any objection to the Court using and applying the 2024 Guidelines Manual? I know that that is a newer manual. It took effect on November 1st, 2025. I compared that manual to those that were in effect on the date of the instant offense and discerned that there's no violation of the ex post facto clause or any other right of Defendant. Any objection to using and applying that 2025 manual in adjudicating these objections?

MR. SLOAN: No, your Honor.

THE COURT: Any objections from the Government?

MS. WOOLAM: No, your Honor.

THE COURT: Okay. So at all times, the Court here is applying that newer manual. If counsel require a copy, the Court can supply that to either party. So here, objection one argues that the two-level enhancement under Section 2G1.3(b)(1)(B) should not apply, contrary to PSR paragraph 26. In light of the Guidelines plain text, the associated commentary and Fifth Circuit precedent, the Court tentatively overrules Defendant's objection number one. 2G -- Counsel may find the relevant guideline section at pages 194 and 195 of that manual. 2G1.3(b)(1)(B) provides for a two-level increase in the offense level for undue influence, quote, if the minor was in the custody, care or supervisory control of the Defendant.

Turning to Application Note 1, the manual further defines minor as an individual who has not attained the age of 18 years, regardless of the state's law on age of consent.

Here, Defendant acted in a supervisory role with respect to the minor, a 17-year-old girl.

Specifically, he was her high school wrestling coach and a teacher at the school. The guidelines commentary explains that the 2Gl.3(b)(l)(B) enhancement is meant to apply broadly and explicitly lists the teacher/student relationship as an example to which the enhancement would apply.

Here, Defendant was not only an educator at the minor victim's school, he was also her wrestling coach. As such, Defendant certainly acted in a supervisory role over the victim. Coaches often have more influence over minors they supervise than ordinary teachers. A similar case arose in the Fourth Circuit, though not binding on this Court. There, the Fourth Circuit found that the 2Gl.3(b)(l)(B) enhancement applied to a Defendant who supervised his minor victims as a Sunday school teacher or coach. Counsel may find that case at *United States versus Grubbs*, 585 F.3d 793. That case is not binding on this Court, but it does lend some persuasive authority to the Court's ruling. Defendant argues the application of this enhancement amounts to double counting. Defendant has pled guilty to Enticement of a Minor. One element of that offense is that sexual activity between the Defendant and the minor was or would have been

illegal under state law. Here, Defendant's conduct was prescribed by Texas Penal Code Section 21.12 which prohibits improper relationships between educators and students. To the extent the student/educator relationship supports the two-level enhancement, Defendant argues it becomes double counting, because, quote, the relationship is built into the structure of the offense. But the Court finds that this argument ultimately fails for the following reasons: Defendant's argument misunderstands the federal offense and the nature of federal sentencing. Defendant pled guilty to Enticement of a Minor. Though that offense refers to the illegality of the relationship under state law, any number of different state laws could apply. Stated differently, the federal offense is blind to the extent -- to the exact circumstances of the illicit relationship. The enhancement appropriately accounts for the nature of the relationship which the guidelines deem especially culpable. Because the base offense level does not assume Defendant's relationship to the victim, applying the enhancement is not double counting. It's just counting. But even if the enhancement double counted the same conduct, the Fifth Circuit has repeatedly held,

quote, that double counting is prohibited only if the particular guidelines at issue specifically forbid it. Fifth Circuit echoed this constant holding in *United States versus Garcia-Gonzalez*, 714 F.3d 306 at 316. Here, there is no such guideline prohibition on double counting. Thus, the enhancement applies to this situation. It does not amount to impermissible double counting because Defendant pled guilty to Enticement of a Minor which does not categorically contemplate a Defendant supervising the victim. Without the enhancement, the guidelines calculation would fail to account for the most egregious feature of the Defendant's conduct; that he enticed a minor under his supervision.

For all these reasons as well as the reasons stated in the Government's response and the addendum, the Court tentatively overrules Defendant's objection number one to PSR paragraph 26.

Mr. Sloan, any additional argument that would not be cumulative?

MR. SLOAN: No, your Honor. We've briefed that fully, I believe.

THE COURT: Okay. And the Court does find

that defense counsel has competently, capably and effectively briefed the issue and that it is preserved for further appellate review.

Anything further from the Government?

MS. WOOLAM: No, your Honor.

THE COURT: The Court adopts its tentative determination as its final finding and overrules Defendant's objection number one to the Section 2G1.3(b)(1)(B) enhancement as reflected in PSR paragraph 26. The Court will apply that enhancement in this case.

Now, objection number two. So this relates to PSR paragraph 27's application of the 2G1.3(b)(2)(B) enhancement for undue influence. So counsel may find that provision starting at manual page 194. And it applies if Defendant, quote, unduly influenced a minor to engage in prohibited sexual conduct. The Court tentatively overrules Defendant's objection for the following reasons and rationales. Application Note 3B expressly explains, quote: There shall be a rebuttable presumption that Subsection (b)(2)(B) applies when, quote, a participant is at least ten years older than the minor. In such a situation, undue influence can be presumed because of the substantial difference in

age between the participant and the minor. Here, the PSR applied that enhancement because Defendant was younger than 18 years old and Defendant was more than ten years older than the minor. Specifically, the PSR reflects that the Defendant was 14 years older than the minor victim.

Against the backdrop of that age gap, Defendant sent text messages to the minor victim, successfully attempting to induce her into sexual activity on at least three occasions. Defendant convinced her to come to his house, a locale where he held a position of power, and convinced the minor victim to engage in sexual intercourse. The age gap supports the application of the 2G1.3(b)(2)(B) application and enhancement, and this is further confirmed in the guidelines commentary which creates a rebuttable presumption where there is at least a ten-year age gap.

Defendant's attempt at rebuttal is reduced to an argument of mutual interest, specifically that the text messages reflect that Defendant and minor victim shared a mutual interest in the sexual activity. But momentary mutual interest does not rebut undue influence. A minor's interest in sexual activity could be evidence of successful grooming.

It does not rebut the presumption of undue influence over a minor. And those text messages reflect Defendant developed a romantic relationship with the minor with the goal of obtaining physical gratification. And some of those text messages reveal Defendant understood that this would be an inappropriate relationship prior to her graduation. But Defendant grew tired of waiting; and in the course of his behavior which resembles grooming, he pursued and consummated that sexual activity.

The PSR also reflects that the minor reported being in a vulnerable position due to a recent breakup, as reflected in PSR paragraph 18. And during that time, she communicated with Defendant because she was captain of the girl's wrestling team which he coached. During that episode of vulnerability, the minor reported that Defendant would, quote, say things to make her feel good. And Defendant therefore abused his position of trust and power by exploiting a minor in a state of emotional vulnerability to satisfy his own sexual lust. For these reasons and the reasons stated in the Government's response and the addendum and the application notes to the relevant guideline, the Court tentatively overrules Defendant's objection

number two to PSR paragraph 27.

Does Defendant have any additional argument that would not be cumulative?

MR. SLOAN: Your Honor, we just note one thing that was not referenced by the Court which is memorialized in Defendant's sentencing memorandum, Exhibit No. 5, approximately the fourth page in; that is the text messages themselves, is that in the course of those early communications, the minor acknowledges initiating the romantic back-and-forth between the two of them. In her words: You're not just saying all this because I started it, right? So that's in -- our position is given the fact that she's legal of an age to consent and essentially initiated the back-and-forth that led to what he definitely admits was wrong conduct, that that rebuts the presumption of undue influence, and that's the basis of our objection.

THE COURT: Is this -- you said Exhibit 5 to the sentencing memorandum?

MR. SLOAN: Yes, your Honor.

THE COURT: And can you give me a page number, using the file stamp that should appear at the top of the document?

MR. SLOAN: I don't have file-stamped

copies, unfortunately, your Honor. It should be the fourth page.

THE COURT: Fourth page of Exhibit 5?

MR. SLOAN: Yes.

THE COURT: Okay.

MR. SLOAN: I apologize. It's Exhibit 6.

THE COURT: Okay. So that begins at page 32 of 57 in document number 55-1.

Ms. Woolam, a response from the Government? I believe he is making a reference to the text interactions between the minor victim and Defendant. And I can read what appears at page 32 and page 33.

And you can tell me, Counselor, Mr. Sloan, where that language appears so that the Court can properly analyze whether this differentiates this case from the guideline, the application notes and court cases applying same?

MR. SLOAN: And Judge, I would say that I have it organized by date and time.

THE COURT: Sure.

MR. SLOAN: So the date and time of the text would be January 24th of 2025, 11.02.04 p.m.

THE COURT: That is helpful. Let me arrive at that timestamp. Okay. So this would be

1/24/25 as the date and then 11:02 p.m. as the time?

MR. SLOAN: Yes, your Honor.

THE COURT: Okay. So here, for all counsel involved, that would be page 35 of 57. And am I correct that the blue text fields as they're printed in this Exhibit No. 6 are the words of Defendant?

MR. SLOAN: And, your Honor, I printed them in black and white. I would say the darker ones that come in from the right are the words of the victim, and the ones on the left are the words of the Defendant.

THE COURT: Okay. That is helpful. So on my color copy, I have that reversed. So this would be -- and you're correct. The blue which would be the darker print in a black and white copy represent the words of the minor victim. And then the gray which appear in a more leftward orientation, those would be the words of Defendant.

So here, on page 35 of 57, at the identified timestamp and date stamp, minor victim says, quote: You're not just saying all this because I started it, right? Is that what you're referring to, Mr. Sloan --

MR. SLOAN: Yes, your Honor.

THE COURT: -- as a material difference that brings this case out of the guideline and the application note; is that correct?

MR. SLOAN: Yes, your Honor.

THE COURT: Okay. Ms. Woolam, are you at the same page?

MR. SLOAN: And just to -- not to put too fine a point on it, but in our opinion, that rebuts the presumption of undue influence.

THE COURT: Okay. Understood. I have your argument. It will be weighted accordingly.

Ms. Woolam, a response from the Government.

MS. WOOLAM: Yes, your Honor. Your Honor, we would also to some extent agree that there are messages from the victim that would amount to a school girl flirtation with the Defendant. That -- we do not believe that rebuts the presumption or otherwise undermines the undue influence because here, even if there's flirtation by a 17-year-old towards her wrestling coach, he was in a position where, one, he should have shut down any improper communication before it got to any point that was anywhere close to even flirtatious. But aside from not shutting it down, he continued to escalate the

contact and escalate the communication. And this isn't undue influence to exchange sexual text messages. It's undue influence to engage in the sexual activity. And it's through his messages that he continued to escalate the communication, continued to escalate his sexual fantasies towards her. And ultimately, he convinced her to sneak out of her house two separate times in the middle of the night, giving specific details and instructions on how to do that and where to go and to hide the behavior so that he wouldn't get in trouble. So all of the messages taken in their -- in total, in the entire relationship and his behavior amounts to the undue influence that is warranted in this case. This is, as the Court's noted, a wrestling coach that she works with at school on a daily basis, even on the weekend and after hours. It is somebody that is 14 years older than her. It's somebody she clearly takes instruction and advice from and probably looked up to. And despite that, he's sending her messages such as the ones detailed in PSR pages five and six and some of which we reference in our response to this objection where he talks about very, very explicit sexual things he wanted to do to her. He also discusses very clearly

where he lived and how to get there and how she needed to sneak out, because he wanted her so F-ing bad. He wanted to ride her face and just let me take control of you. I want you to come get dicked down right now. I want you to come be a good girl for me, et cetera, et cetera. I don't need to necessarily read all of the messages. The totality of the circumstances in this case show that Mr. Hermann was unduly influencing "Jane Doe" for the sexual activity that he ultimately engaged in. Not some sort of mutual flirtation. So that's -- when looked at in context, I believe, yes, she may have been somewhat flirtatious, but his actions taking this further, taking this into a manipulative behavior that led to her sneaking out of the house so that he could fulfill his sexual desires is what warrants this two-level increase for this.

THE COURT: Thank you, Ms. Woolam. I have the argument of the Defendant and the Government in written form and then also oral argument at the sentencing hearing. I do find that the Defendant through competent and effective counsel has attempted to rebut the presumption marshaling arguments in evidence in written form and then also highlighting for the Court's attention this one text

message appearing on page 35 of 57 in document 55-1, specifically the language by the minor victim, quote: You're not just saying all this cuz I started it, right?

But on balance, the Court finds that the Government has the better argument and the better case on this objection number two. And it resonates more consistently with the plain text of 2G1.3(b)(2)(B) and also the totality of the evidence when this one reference to I started it, right is balanced against the totality of text messages, it's insufficient. In fact, woefully insufficient to overcome the rebuttable presumption that an age-gap of ten years involves the type of undue influence warranting the enhancement.

Here, Defendant has repeatedly requested by text message that the victim move away from campus, away from the wrestling gymnasium and towards his private residence for purposes of sexual intercourse. Additionally, this text interplay at this point has been progressing for close to a year. And that makes it unclear exactly when lawful interactions between coach and wrestler descended into the type of undue influence contemplated by the 2G1.3(b)(2)(B) enhancement.

So this is a scenario where the overwhelming totality of text messages balance against Defendant's argument; and as such, he has not rebutted the presumption under (b)(2)(B). For those reasons and reasons stated in the Government's response and the addendum, this Court overrules Defendant's objection number two. This Court adopts its tentative determination as its final finding and adopts the findings and conclusions set forth in the corresponding PSR and addendum paragraphs. And when combined, the Court's overruling of Defendant's objections one and two mean that this Court will apply the analysis and findings in PSR paragraphs 17, 26, 27 and 38. And so the Court does adopt the findings and conclusions appearing in those PSR paragraphs alongside the relevant addendum paragraphs.

Now, the Court further states that defense counsel has competently and effectively preserved for further appellate review any arguments specific to objections one and two, and the Court finds that those arguments are preserved for further appellate review.

Now, Mr. Sloan, are there any untimely objections, responses or requested clarifications

relevant to the PSR and addendum?

MR. SLOAN: Judge, the only untimely thing I'm aware of filing was the list of sentencing memorandum exhibits which was filed last week which are the letters that support. That's the only thing I'm aware of being filed untimely.

THE COURT: The Court is waiving any deadlines that applied to the sentencing memorandum exhibits comprised of letters from persons submitting character statements. This is document number 61. That includes Exhibits 1 through 14. And even though those were arguably untimely, the Court finds that defense counsel had good cause for the late submission. And because they are relevant to this Court's sentencing decision, the Court will consider and give appropriate weight to each and every letter submitted as an exhibit to that sentencing memorandum. Is that all in the -- in terms of anything untimely?

MR. SLOAN: Yes, your Honor.

THE COURT: Okay. Anything untimely from the Government in terms of an objection, a response, or a requested factual clarification that would affect the PSR?

MS. WOOLAM: No, your Honor.

THE COURT: Okay. So let's turn to acceptance of responsibility. So here, under Guideline Section 3E1.1(b), the Defendant may qualify for a one-level deduction upon motion of the Government if he assisted authorities in investigating his own misconduct and timely noticed his intent to plead guilty. Here, PSR paragraph 22 states that the Defendant did both. Does the Government agree and move this Court to grant the one-level deduction for acceptance of responsibility?

MS. WOOLAM: Yes, your Honor, the Government so moves.

THE COURT: The Court grants the motion and will apply the third point for acceptance of responsibility in calculating the advisory guidelines range which must serve as our starting point before considering any variance.

Having ruled on Defendant's timely objections and having waived the deadlines that apply to the untimely sentencing memorandum submissions, this Court adopts the remaining findings and conclusions of the PSR and the addendum in their entirety.

And I'll turn now to the guidelines

calculations. As I stated earlier in the hearing, this Court intends to use and apply the 2025 Guidelines Manual. And I've already found that that manual will not violate the ex post facto clause or any other right of Defendant.

Now, before correctly calculating and announcing the advisory guidelines range, I do want to note the considerable impact of the plea agreement negotiated by Mr. Sloan. So here, Defendant could have faced a maximum sentence of life imprisonment and a possible statutory maximum fine of up to $250,000. So this Court finds that defense counsel capably, competently and effectively negotiated a plea agreement that radically reduced Defendant's possible sentencing exposure.

Having considered the probation officer's calculations and conclusions in the PSR and addendum and now having ruled on Defendant's objections thereto, the Court finds that the correct advisory guidelines range is as follows: Total offense level 38. Criminal History Category I. An imprisonment range of 235 to 293 months. A supervised release range of five years to life. A fine range of 50,000 up to $250,000. And restitution in the form of mandatory restitution. I understand that there's a

pending motion for downward variance. But before we adjudicate that motion, is there any objection to the Court's calculation of the advisory guidelines range which must serve as our starting point?

MR. SLOAN: Your Honor, subject to the Court's prior rulings, then no.

THE COURT: Okay. So any objection to the calculations?

MS. WOOLAM: No, your Honor.

THE COURT: Okay. And again, the Court finds that those prior timely objections were adequately preserved for further appellate review. But those now having been in the rear-view mirror, the Court will use and apply those calculations and that advisory guidelines range.

Now to the main event, which is the pending Motion for Downward Variance. As counsel for the Defendant and Government both know from their many hearings before this Court, it's my practice to give you the 3553(a) by 3553(a) analysis which explains the Court's tentative determination. And then I'll invite responsive argument for or against the motion for variance as long as it's not cumulative of your papers before the Court.

I'll admonish any members of the gallery,

if you're squeamish about details that could be upsetting, details that are of a sexualized nature, you should excuse yourself at this time. Unlike Ms. Woolam, I went to inner-city schools in Fort Worth, and I don't use the polite version of words. So if that would upset you, you should remove yourself from the gallery.

The Court has tentatively determined that a non-guidelines downward variance to a term of imprisonment below 235 months is sufficient pursuant to the following 3553(a) factors. Specifically, first, Section 3553(a)(1), which requires the Court to consider the history and characteristics of the Defendant. Here, Defendant has no prior criminal convictions. This is accurately recounted in PSR paragraph 43 and the papers submitted by defense counsel. The PSR also describes a history of mental episodes and instability. Additionally and importantly, Defendant was himself molested by an uncle at six years old, but his outcry was never referred to law enforcement, as detailed in PSR paragraph 51. The Court finds that these Section 3553(a)(1) facts and factors are mitigating in this case, and the Court intends to weigh them accordingly.

Second, pursuant to Section 3553(a)(1) and (a)(2)(A) which requires the Court to consider the nature and circumstances of the offense, to reflect the seriousness of and to provide just punishment for the offense. Here, Defendant used his status as coach and teacher to sexualize and victimize a minor student. Unobjected to PSR paragraphs reflect Defendant texted the minor's cell phone for nearly a year, totaling 4,452 messages between the two. This is reflected in part in PSR paragraph 13. It is true that many of those messages did relate to wrestling as an athletic activity. But eventually, those messages turned overtly and inappropriately sexual. The PSR lists several of the texts sent, including the following, quote: I have to have you. I want you to ride my face and just let me take control of you. I want you to come get dicked down. You know where I live. Then come over. Come over, and I'll eat you out. PSR paragraph 14. These texts show a persistent attempt to induce the minor into sexual activity. Defendant's repeated instruction that the minor should come to his residence emphasizes the pressure Defendant placed on her to comply with his sexual desires. Soon, after Defendant succeeded in persuading the minor to

have sexual intercourse, he renewed those efforts and sent the following texts, quote: I need to be choking you. I wish I could torture you and literally fuck your throat until you're crying. But like I'm not just saying that. I need to do it right now. It's like this primal urge to just fucking tear you apart, as reflected in PSR paragraph 15. Several texts reflected Defendant's warped sexualized and fetishized vision of the mentor/mentee coach-to-player or student-to-teacher dynamic. As examples, and I'm quoting from the PSR. And these are not objected to. Quote: I want to take you into my office and bend you over my desk. Quote: I'd have to cover your mouth to make sure you weren't too loud. Quote: Making you moan my name and call me daddy. Defendant indicated he understood a physical relationship would be illicit and that that -- they would necessarily need to wait until she graduated. This is reflected in unobjected to PSR paragraph 14.

Defendant contemplated the consequences but did not allow those consequences to deter him. Instead, Defendant became impatient and instructed the minor to visit his residence for intercourse which occurred on three separate occasions. And

that is not contested by Defendant.

When law enforcement contacted Defendant, they observed him attempting to delete messages on his cell phone and the Court has already adjudicated the relevant objection to that finding. And of course, those deletions were contrary to their instructions. This is all detailed in PSR paragraphs 17, and the Court has already adjudicated any objections thereto.

Defendant was 14 years older than the minor victim and was in a position of power and abused his trust for his own sexual gratification. For those reasons, the Court finds that the aforementioned 3553(a)(1) and (a)(2)(A) facts and factors are aggravating in this case, and the Court weighted them accordingly.

Third, Section 3553(a)(2)(A), (a)(2)(B) and (a)(2)(C), which requires the Court to promote respect for the law, afford adequate deterrence to criminal conduct and protect the public from further crimes of this Defendant. Here, a significant sentence is needed to promote respect for the law and protect the public from further crimes of the Defendant. Here, Defendant abused his position of power and supervision to gratify his own desires and

risked significant harm to a minor in doing so. Defendant showed an inability to control himself, even though he admitted and realized his actions were potentially wrong and illicit.

All of that said, the Court has received myriad character statements and additional facts in the PSR that are deserving of mitigating weight, and Defendant is persuaded -- I'm sorry. The Court is persuaded that Defendant may have been motivated at least partially by a mental health episode and crisis rather than more persistently predatory and dangerous motives.

In total, the Court finds that the 3553(a)(2)(A), (a)(2)(B) and (a)(2)(C) are slightly more aggravating and with specific attention to the protect the public element of those aforementioned (a)(2)(A), (a)(2)(B) and (a)(2)(C) facts and factors.

Now, finally, the Court must consider Section 3553(a)(6). Under that sentencing provision, this Court must be mindful of the need to avoid unwarranted sentencing disparities. Specifically, this is a national inquiry. So Defendants and defense counsel often misplead their 3553(a)(6) arguments by pointing to codefendants or

members of a criminal organization to complain about sentencing disparity. Here, the Court is applying the (a)(6) factor as intended as a national inquiry. And the Fifth Circuit has repeatedly held that 3553(a)(6) requires only that the Court avoid unwarranted disparities between similarly situated Defendants nationwide. And that is what the Court does here. The relevant comparators are derived from the Judicial Sentencing Information platform or JSIN, sometimes stated as an acronym, JSIN, and that database and those searches reflect that Defendants convicted of similar offenses received on average a sentence of 216 months. The median sentence for similarly situated defendants was 205 months. This case does not prevent facts that warrant a significant disparity in sentence, thus a slight downward variance from the guidelines range of 235 to 293 is necessary to avoid unwarranted sentencing disparities. And as such, the Court finds that this 3553(a)(6) factor and facts present mitigating reason to grant -- at least partially grant the downward motion for variance. On balance, the aggravating Section 3553(a) factors warrant a serious term of imprisonment, but the mitigating Section 3553(a) factors warrant some downward

movement from the applicable advisory guidelines range. And the Court has tentatively determined but will reserve for final argument its determination that 216 months would adequately serve both purposes, giving appropriate balance to the 3553(a) factors deemed aggravating and the 3553(a) factors deemed mitigating.

So the Court has tentatively determined that it should grant Defendant's Motion for Downward Variance to a sentence below 235 months imprisonment, and the Court has tentatively arrived at 216 months, but I will afford counsel one final argument. And we will take that up shortly.

But right now, is there any additional information or argument responsive to the tentative determination on the motion for downward variance? Mr. Sloan?

MR. SLOAN: Your Honor, I would note that in the presentence report and in the -- in the charge, reference is made to Texas Statute 21.12. The Court has brought up 3553(a)(6), the need to avoid unwarranted sentencing disparities. And in consideration of that, I would note that the maximum sentence that Mr. Hermann could receive under Texas Statute 21.12 is a sentence of 20 years. But that

under that sentence, he would be eligible for parole in two years, four months and 12 days. And he would be entitled to mandatory release in nine years, five months and 18 days. Those figures are derived from Defendant's sentencing memorandum. I believe it is Exhibit No. 5 which is the table. And although I did not raise sentencing disparities -- sentencing disparities directly in our sentencing memorandum, I believe I danced around them in my references to state law. So I would ask the Court to consider those factors in addition to the ones the Court has raised sua sponte in this context. And then I have a generalized sentencing argument to make which -- if this is the time for that, I'm ready to go.

THE COURT: Yeah, we're just dealing with the Motion for Downward Variance. So I think I have your argument on that, and that is without prejudice to you making one final argument on the sentence imposed.

MR. SLOAN: Thank you, your Honor.

THE COURT: Any response to the various arguments for downward variance?

MS. WOOLAM: Yes, your Honor. Just briefly. We did file our motion -- or our response to the Defendant's downward -- Motion for Downward

Variance, but just to touch on a few things. We believe that the aggravating factors of this case outweigh the mitigating factors such that a sentence within the calculated advisory guideline range is appropriate. Specifically, there is evidence the Defendant has submitted and is discussed in the filings about the Defendant's mental health state, that we would note that even though he had apparently this -- these mental episodes and at least one mental episode that required hospitalization, he still chose to place himself in this position of trust over students, thus placing students like the victim in this case at risk of his actions.

Further, his role as a coach, of course, and specifically as a coach over the victim in this case was an aggravating factor that led to his ability to unduly influence her and manipulate her into the sexual contact. We'd also note that, of course, the messages that this Court just discussed and are noted in the PSR are aggravating because they do discuss tones of violence and violence specifically towards that 17-year-old student that he was supposed to be responsible for educating and coaching.

Furthermore, the one other thing I would like to note is in terms of protection of the public and specifically deterrence and promotion of respect for the law. Here, as noted in paragraph 38 and we've discussed it, there was at least at some point an allegation known to Mr. Hermann or information known to Mr. Hermann that he -- that there were rumors or something of inappropriate contact with two other students. We don't have evidence before this Court or to offer to prove any inappropriate relationship with any other students than the victim in this case, but what that information does is shows that Mr. Hermann, of all teachers, was on notice how serious it is to inappropriately communicate with and contact students. And despite that, he engaged in the behavior that led to the criminal charges in this case. So that just goes to his need for deterrence and promote -- promoting respect for the law and protection of the public because this is somebody that knew that that was a grave and serious consequence and he did so anyway. That's further shown by his messages to the victim herself where he repeatedly references the fact that it's an illegal relationship and that he could get in trouble for the behavior. And despite that, he

chose to engage in the relationship he did.

THE COURT: So Ms. Woolam, you have my ruling on Defendant's objection number four specific -- to that PSR paragraph 38. If I hear you correctly, you are not adducing any evidence of the inappropriate relationships referenced in that paragraph. You're not asking the Court to reconsider its ruling on objection number four, simply noting that because of that interaction with at least one APD officer, Defendant was put on notice that such a student/teacher relationship would be violative of various rules.

MS. WOOLAM: Absolutely, your Honor. That's correct.

THE COURT: So the Court will only weight it accordingly. You already have my ruling on objection number four, and I'm not in any way giving weight to events and episodes that were part of mental health utterances, but I do understand your point.

MS. WOOLAM: Yes, sir.

THE COURT: Which was whatever those rumors and whatever those alleged inappropriate interactions, at least that interplay with the APD officer, put him on notice that that would be

inappropriate.

MS. WOOLAM: That's correct, your Honor.

THE COURT: Okay. I have your argument. You may continue.

MS. WOOLAM: Your Honor, simply that. For those reasons and as stated in our response to the motion, we believe that a sentence within the advisory guideline range is appropriate.

THE COURT: Okay. I have your argument. I also have your papers. Here, the Court did a very deliberate balancing of all the 3553(a) factors and undertook its own inquiry into JSIN data. Even though the Fifth Circuit has not yet ruled on whether the Court must conduct an independent inquiry into such data under 3553(a)(6). On balance, the Court finds that a sentence slightly below the advisory guidelines range is necessary to give appropriate mitigating weight to the factors and facts identified by the Court. And on balance, the Court agrees with Defendant's motion and argument that several mitigating factors and facts warrant some downward movement and variance, and the Court intends to do so here. For those reasons, the Court adopts its tentative determination as its final finding and finds that a non-guidelines

downward variance to a sentence below 235 months' imprisonment is appropriate and necessary to give a valid weighting to the 3553(a) factors deemed aggravating and the 3553(a) factors deemed mitigating.

In response to Defendant's exhibits calculating sentences imposed under Texas law, that's simply not the purpose of 3553(a)(6). That's not the type of unwarranting sentencing that matters because that 3553(a)(6) factor instructs the Court -- the Court to consider unwarranted sentencing disparities among Defendants found guilty of similar conduct. Here, specifically, a Defendant charged with Enticement of a Minor under 18 U.S.C. Section 2422(b) and then of course with the attendant criminal history calculations, total offense level calculations and the rest, all of which were entered into the JSIN database. That the State of Texas may choose to more lightly punish conduct of this variety is irrelevant to the 3553(a)(6) inquiry.

Here, the Court must decide between similarly situated defendants nationwide as they are charged under federal law, and the similarly situated analysis focuses on federal defendants of

similar total offense levels, criminal history categories and the rest. So that is a federal inquiry, not a state inquiry. And that is the purpose of a 3553(a)(6) unwarranted sentencing disparity inquiry.

So for all those reasons, the Court adopts its tentative determination as its final finding, and I do grant the motion for downward variance to the extent described in the Court's analysis.

Now, let's turn to statements, final arguments and allocution. In this category of offense, Ms. Woolam, there's often victims who submit statements. Did the Government comply with any and all victim reporting requirements?

MS. WOOLAM: Yes, your Honor.

THE COURT: And I see that the Government has submitted a victim impact statement as that appears in ECF document number 58-1, page ID 262. Do you intend to present this as a victim impact statement in this case?

MS. WOOLAM: Your Honor, we do not intend to read that statement aloud, but we do ask that the Court take it into consideration as a victim impact statement, your Honor.

THE COURT: Do you have any additional

victim impact statements?

MS. WOOLAM: Yes, your Honor, the mother of the victim would like to make a victim impact statement in person here today.

THE COURT: I'll ask that you call that first victim impact statement by live testimony.

MS. WOOLAM: Yes, your Honor. That is Britney Kemp Stone if she could please come to the front. Your Honor, would you -- would it be okay if she's at podium or would you prefer --

THE COURT: Podium is fine. So Ms. Stone, you may approach the podium. I would ask you start with a statement of your full name and then you can take as much time as you need.

VICTIM IMPACT STATEMENT

BY BRITNEY NICOLE KEMP STONE

MS. STONE: Okay. My name is Britney Nicole Kemp Stone, and I am "JKS"'s mother. I have thought about what I wanted to say in this victim statement for over a year now. What words would I want to leave Mr. Hermann with at his sentencing. I knew he needed to know how his actions did not only affect him and my daughter but our family.

But before I could actually sit and write my words out, I had to first try to convince my

daughter to do the same. Hers were the most important. She needed to be able to address her concerns and feelings before my own. She needed to find her voice in this when she felt she had none. Imagine trying to tell your own daughter whom has always been the smartest in the room and way smarter than you to write how she felt being a victim of the one she trusted most. To sit and relive the moments that have now defined the direction of where her life will go and how this makes her feel. Her response is fearful. Fearful of retribution by Hermann when he gets out and fearful for her not yet born daughter's life. Hearing those words come from her as a parent are heartbreaking and yet they are mine as well.

Since our children are young, we are told to make them go to school. To trust these complete strangers to watch our most prized possessions and keep them safe for at least eight hours a day. When you have a child athlete, those eight hours become quite longer. You have morning practices, after-school practices, out-of-school session practices, traveling and tournaments, all with mostly men in the athletic world of wrestling. My daughter was on a mission to place at State. She

made it her junior year. And by God, she was going to place her senior year. This was going to secure her college career at Wayland which he urged her strongly she should not go. That she needed to leave her parents far away. That was odd, I felt. Why does this coach want her away from her parents? I watched her prepare for her season in the gym, looking like she was preparing for the Olympics and I watched her cut weight for each tournament and be so determined on what she was doing. As a mother, this is painstaking to see what they do to their bodies to accomplish their goals. She was always saying well, Hermann said whenever we would voice concerns. He wanted her to drop even more weight to go a lower weight class which we felt was extremely dangerous and had to convince her to go against him. She was reluctant because anything he said, she felt she had to do. When she would lose a match, her biggest upset was not the match but disappointing him, her coach.

When you sit back as a mother, you feel stupid for asking yourself because you trust this man. You've sat next to him at dinner in another state, celebrating your child's accomplishment. He's in her big moment win pictures. He's on the

sidelines screaming for her victories. This man has no ill-intentions. He couldn't. There's no way, is there? Then you get the call, the call that took the air right out of my lungs. In my head of reason, I was thinking no way. No. He's going to give his phone to authorities with no issues and this will just be a bad rumor. But in my heart, I was screaming I knew it. I immediately turned to guilt. This was my fault. I allowed her to join this sport. I allowed her to be coached by him. I knew they exchanged meme texts and I had always asked why do y'all text at all. She would say they were just dumb memes about things they spoke that day in practice. I chalked it up to he was a man child. He never seemed like the level of Stafford or Ritchie, just childlike in his interactions with the kids. I guilted myself about not taking her phone from her at night. If I had just made my daughter turn in her phone every night, this could have been prevented. Yet I allowed her to keep her phone for the early morning alarm she would set to go to the gym. I had spoken to her about improper relationships and asked if everything was okay. Now I had to stop feeling -- stop my feelings about guilt and go into fix mode. How do I fix my broken

daughter? She was convinced he loved her. She could only win matches with him by her side. He made her feel like she couldn't do anything without him. He had been her coach since she was 14. This isn't love. It is grooming. I had to tell her to muster up the strength to finish school and the season because her future doesn't end with his horrific decision. I had to watch her be told by the school to either quit Tascosa or go online only. I had to watch her get the strength to go to wrestling practices with his family members to finish her season. I had to watch and hold her cry after a match where the opponent had heard the situation and used it to their advantage to get into her head. We took "J" to the doctor to make sure she was not pregnant. We placed her in therapy. We stayed by her side through every match afterwards. We supported her decision not to pursue wrestling in college.

The impact of this crime hurt myself and "J" but also hurt the rest of my family as well. My youngest had to watch her older sister go through this; and now as a result, I'm extremely overprotective of her. If a male coach is mentioned, I immediately get a pit in my stomach and

want to say no. My oldest son was the one who retrieved the iPad that was linked to her phone for the text messages, and he saw them. This was not something for him to have had to see. Our middle son was the one who had to help catch her when she was running away when the incident was discovered. Watching him cradle his sister to calm her down when she was caught was heartbreaking. My husband had to deal with internal battle a father has when these traumatic incidents occur. Does he take actions into his own hands or wait for the judicial system to take actions? "J"'s strong, but due to this crime, she will forever be changed, especially as a mother.

I want to thank the Court for sentencing him to stop this beast from repeating actions in future athletes. All mothers thank you.

THE COURT: Thank you, Ms. Stone. The Court will give appropriate weight to your character statement, and I do want you to know there is a victim impact statement from the minor victim. Counsel for the Government has not asked the Court to read aloud, but I want you to know both of you were seen and heard through this process.

THE WITNESS: Thank you, Judge.

THE COURT: You may return to the gallery.

Ms. Woolam, do you intend to call any additional character statements through live testimony?

MS. WOOLAM: No, your Honor.

THE COURT: And at this time, I'll turn to defense counsel. Mr. Sloan, I waived all deadlines that applied to admit a series of character statements attached to your sentencing memorandum as Exhibits 1 through 14, and I'll read aloud now the names of the persons that submitted character statements on behalf of Defendant: Anthony and Kirstan Hermann, Tricia Cannon, Kirstan Bourn, Noe More. Last name M-o-r-e. Christopher Pilgrim, Theresa Taylor, Breana Rule, Deedra Pacheco, Jamie Badillo, Josh Rule, Rachel Andersen, Erica D. Brassfield, Irma P. Clark and Ronnie J. Tolbert. Again, all applicable deadlines are waived. The Court will give appropriate weight to those character statements in written form. Do you intend to present any character statements through live testimony?

MR. SLOAN: Yes, your Honor. Mr. John Johnson and Ms. Kirstan Hermann.

THE COURT: At this time, Mr. Johnson, you

may approach the center podium. Please start with a statement of your full name.

THE WITNESS: My name is John Oscar Johnson.

THE COURT: You may proceed.

JOHN OSCAR JOHNSON,

called as a character witness herein states the following:

MR. JOHNSON: So I'm here today to basically give the character that I know of Nick Hermann. And I know I've known Nick since he was six years old. And I wanted to give the Court and all involved what I know of Nick. And I think that's important. This case is -- is a tough one. I met Nick when I was an assistant coach with his father at the Maverick Boys and Girls Club at six years old. I personally have a wrestling background. I also have a coaching and teaching background. Graduated from University of Nebraska. I'm also a business owner here in Amarillo, and I coached young -- youth wrestlers for 25 years. So the character that I know of Nick -- and I'm talking when he was six years old. My boys were four and three years old. But I watched him the first year take in young kids as a young man himself and

helping them, encouraging them. And then there was kids that were ten, 12, 15 years old. And as a six-year-old youth person really had a lot of passion, a lot of help and encouragement. I left this particular club a year later, started my own club. And as -- people would think that we were rivalries. What I saw -- and I thought really a lot about this. I saw this young man; six, seven, eight, nine years old, setting on the edge of the mat not with just his teammates but other teammates in the community encouraging them along the way. And as boys grow up, I'm just an observer. But I'm also coaching and helping and, you know, doing my best to coach youth -- youth sports. Not just in wrestling but in other sports. So I pay attention a lot to what parents do, how parents overreact or underreact and how kids respond. What I did notice about Nick when my oldest son was a seventh-grader, he came into the high school, and he -- three years younger than Nick. I think Nick may have been a freshman at that time. And the same encouragement came. And one of the things that I would highly -- and I'm just -- I don't know, along the way -- things happened along the way. But at this time as a freshman in high school, there's a lot of --

there's just a lot of things that go on. And he pulled my son to the side, and he said I'm going to tell you something. Don't hang out with those kids. I got ya. I got your back. That is leadership. I don't know if Nick was taught leadership, but it's a gift that I know in my personal life that God has given me, and I really believe as a young man at six years old, he's given that gift of leadership. I watched it. I personally watched for it for 20 -- 20 plus years. I've -- my timeframe with Nick was from when he was six years old to when he was 26 years old. And I watched him through those times. Good times, bad times, even when he was away from the high school level, he was mentoring back, calling, helping, encouraging all groups of people. And I was really encouraged to see him come in as -- as a helper because I knew how much of a leader he was. As a teacher and a coach, I -- it's -- it's the highest honor you can have. And I understand a tough situation has happened here, and I'm not condoning any of those things. I'm just giving you the character of a young man who led 15 years old -- 15-year-old kids at six years old. And I watched that over 20 plus years, that leadership.

In my sport which is wrestling, I also

know along the way -- and I wasn't going to go here, but I'm going to go here because it was mentioned, is there are some mental health things that happen to kids, adults. Situations, head injuries, traumatic brain injury. And I'm really excited about Secretary Kennedy which he's putting almost $800 million into the economy to help situations, situations like this, on both sides of the party. Mental health's a real deal, and it changes people. And I don't know -- I'm not here to judge either direction. I'm just here as a man standing here taking up for a young man that I watched for a long time. And I don't know what happened along the way. Things that could have happened, could -- I don't know that answer. I'm not here for that reason. I'm just here as a man, as a coach, as a business owner, to let the Court know that that young man, six years old, and where he is today, that I love who that person was and is and I know that person is in there. And, you know, getting the right help, the right therapy -- not just with him but in everyone that's involved in this case. Whether it's parents, whether it's victims. Whether it's a standby person, I don't know that answer. But especially -- I would say for Nick and the victim, I

would say that therapy, that mental help, those things that can occur that the Court has control of, I would think would be a great honor to put him in a good situation to where he can get the right help that's needed.

One reason I would tell you, though, and I'm going to close with this. In my own life, I've lived through a lot. I think we all have. If you haven't lived through something traumatic, you can't lead someone else through something traumatic. You -- we just don't have that capability. I can only do certain things because I've only lived certain things. And I think each and every one of us in life, if we've lived it and we learn from it and we grow from it, we can help others and prevent others from going there. And as a leader and someone that has that gift, Nick will embrace that. I think taking a really tough, rough horrible situation can really help a lot of people along the way in the future. And with that, I'm going to close and thank you for the opportunity.

THE COURT: Thank you, Mr. Johnson. The Court will give appropriate weight to your character statement. You may return to the gallery.

At this time, Mr. Sloan, you may call your

next character statement by live testimony. I think you had mentioned Ms. Kirstan Bourn.

MR. SLOAN: Kirstan Hermann.

THE COURT: Hermann, okay. Ms. Hermann, you may approach the center podium. Please begin with a statement of your full name. Then you can take as much time as you need.

KIRSTAN RENEE HERMANN,

called as a character witness herein states the following:

MS. HERMANN: Thank you. My name is Kirstan Renee Hermann. Your Honor, I'm here today as the mother of Nicholas Hermann. This has been a deeply painful and humbling time for us all. We know that Nick has made mistakes, and we do not excuse his action. We just want to share with you the person we know and love and how he has shown kindness, responsibility and love in so many parts of his life. Nick has been -- always been a loving, respectful and hard-working individual. While I acknowledge he has made mistakes, I believe they do not define his true character. From a young age, he has shown kindness towards others, a willingness to help those in need and a strong sense of responsibility towards his family. He is such a

sweet and genuine person who will stop and render aid when needed. He has helped his dad whenever asked, even if it's early in the morning. He has been by my side every time the decision was to put our beloved dogs to rest. On any given day, he will help people who have been stuck in the snow or rain. While his dad sometimes work at night, he'll come over just to hang out with me so I won't be alone. He is a good big brother, an uncle who has helped teach life skills and he has a love for animals.

Even while being at Randall County Jail, he's helped another inmate study for his GED testing. He was -- also utilized his time by completing educational modules.

I respectfully ask the Court to consider his positive qualities, his efforts to make amends and his potential for rehabilitation while determining the outcome of his case. Although he has made mistakes and taken responsibility for his actions, it does not define who he is. It is not a reflection of the character, integrity and values that I've known and worked to install in him throughout his life. I am committed to supporting him fully in his journey towards becoming a better member of society. Thank you.

THE COURT: Thank you, Ms. Hermann. The Court will give appropriate weight to your character statement. You may return to the gallery.

Mr. Sloan, does that complete the character statements you would submit through live testimony?

MR. SLOAN: It does, your Honor. Mr. Hermann will want to make allocution at some point. But other than, that's all I have.

THE COURT: I'll afford defense counsel your preference. Would you prefer to do allocution followed by argument or vice-versa?

MR. SLOAN: I think vice-versa. I think I'll do argument and then allocution.

THE COURT: Okay. So here you have the Court's ruling on the Motion for Downward Variance. That was granted, and I previewed the Court's tentative determination that a downward variance to 216 months would adequately serve the purpose of sentencing and appropriately balancing -- and would appropriately balance the 3553(a) factors deemed aggravating and those deemed mitigating. But that's without prejudice to either party arguing for a different result. If you make an untimely motion for variance, you must use the 3553(a) factors. If

you make an untimely motion for departure, you must identify the relevant guideline sections. And please recall that the 2025 Guidelines Manual repealed several prior departure sections. And at all times, a motion may be denied simply because it is untimely at this point.

Because the Government is the initiating party here, I'll start with the AUSA and then turn to defense counsel for final arguments.

MS. WOOLAM: Yes, your Honor.

THE COURT: Ms. Woolam, you can proceed. This isn't like the Fifth Circuit where you have to wait for the nod from the chief judge or anything. You may proceed.

MS. WOOLAM: Thank you, your Honor. Yes, your Honor.

Your Honor, the Government, as argued before, we believe a sentence within the advisory guideline range of 235 to 293 months is and was appropriate here. But given the Court's tentative finding or tentative ruling on the Motion for Downward Variance, we simply ask that this Court consider no sentence less than 216 months. Mr. Hermann's conduct was egregious. We've discussed it quite a bit already, and it's been

briefed thoroughly to this Court.

But Mr. Hermann took advantage of a vulnerable student and wrestler that he had interactions with every day since she was approximately 14 years old. He would see her after hours. He would see her on the weekends. As discussed by her mother, he was partly involved in controlling her weight and other aspects of her life. She looked up to him. She molded her life and her daily activities around this man. And rather than be a good coach, a good teacher, a good mentor, he sexualized her and used her for his own sexual gratification.

Had he done all the right things, had he been the person that the character statements and character letters discuss, he would have encouraged her on the right path. He could have encouraged her to focus on wrestling in college. She could have possibly been a state champion. She could have possibly gotten a wrestling scholarship for college. She could be on a very different life trajectory. Instead, he chose to sexualize and demean her, encouraging her and pushing her to sneak out of her house disobeying desires to go just blocks away where he lived to his house where he could engage in

sexual activity with her. He demeaned her with statements that he made to her about, as the Court noted, wanting to fuck her so bad, wanting her to ride his face and let me take control of you. Wanting her to get dicked down. To be a good girl for him. He talked about violent things he wanted to do to her, and he made her a sexual object to him. A 17-year-old student that was 14 years younger than him.

And as a result of his actions, her life trajectory has changed completely. Often I'm before courts talking about what could happen as a child grows up. But we know what's happened to this young lady's life. And Ms. Kemp Stone gave an amazing impact statement to discuss the impact that this has had on her daughter and their family. She didn't wrestle the same anymore. She didn't pursue the same interests with wrestling and college scholarships that she had. And likely as a result of the Defendant's sexualizing her and demeaning of her, she's now a 19-year-old pregnant woman. Her entire life trajectory has changed. And she will have to live with the consequences of this her entire life.

I -- I agree with a lot of the things that

have been said in this Court today, and I'll highlight specifically something that Mr. Johnson said. And to his credit, I thought he gave a very, very appropriate statement here in court. But he mentioned that when somebody's been through something traumatic, it can be helpful for them to lead because they can help prevent trauma in others. Mr. Hermann did exactly the opposite of that. Despite his traumatic upbringing and childhood, as discussed in the defense sentencing memo, he sexually abused a 17-year-old student for his own sexual private fantasy. He got her to lie. He manipulated her, and he tried to hide it from law enforcement. That's not the leadership and mentorship that he should have been giving. That's a distinctly different individual than the one noted in the character letters. And that's why we're here today. Because of the sexual abuse of this 17-year-old girl.

The facts and circumstances of this case are egregious. The Defendant used his position of trust and his position as a wrestling coach over this student, this child, for his own sexual gratification. He said demeaning and derogatory things to her. He got her to sneak out of the

house. Sneaking out of the house to stay up 'til all hours of the morning for his sexual purposes which took focus off her one and only job as a high school student which was to go to school and do well in school. Instead, she was going to school tired, unable to focus, as is discussed in the messages between him and the child.

A significant sentence needs to be given here, to promote respect for the law, which Mr. Hermann showed he had none as he repeatedly mentioned he knew his conduct with her was illegal, but he just could not resist and he engaged in it anyway. A significant sentence needs to deter his future conduct so he never does anything like this again. And most importantly, a significant sentence needs to protect society and specifically children.

And for all of those reasons, the Government does ask for this Court to issue a significant sentence of at least no less than that 216-month sentence the Court has tentatively determined is appropriate. Thank you, your Honor.

THE COURT: Thank you, Ms. Woolam. The Court will give appropriate weight to the argument of the AUSA. I'll turn now to Mr. Sloan serving as defense counsel. You may take as much time as you

need. You may do so from counsel table or the podium.

MR. SLOAN: Thank you, your Honor. First I would note that there's over 30 people in the courtroom here who love and support Mr. Hermann and have come to lend their support to him. And I want to express my personal gratitude to them. And I know Mr. Hermann feels the same way. That's unusual, not unheard of, for that many people to come to a federal sentencing. But it is unusual, and I think it's notable for the Court.

I know the Court has already ruled that 3553(a)(6) doesn't really intend to refer to state offenses or state outcomes, and the Court has recognized that the state has -- has opted to treat these cases more leniently than the federal offense which the Court distinguishes. I would just note that we do take issue with that position. It's our position that because the federal prosecution depends on that state statute that they're inextricably intertwined and that the sentence -- even the downward variance the Court has indicated a -- that it is considering, even that downward variance is significantly higher in its effect than the maximum state sentence would be in terms of how

much time a person actually serves before they're eligible for mandatory release; or on the federal side, before they're eligible for release on supervised release. I believe that is important because then you're left with the question what distinguishes this case from a case warranting a maximum sentence in state court. And I think that those mile markers, the state's definition of the age of the consent, the state's definition of what the penalty should be for violation of this law, especially considering we're talking about a state employee interacting with a student in a state institution, I believe those mile markers, those flag posts are important for the Court to consider, and I would ask the Court not -- to at least allow those mile markers to hold some weight in what happens here.

The sentencing memorandum that we've submitted goes into some detail about Mr. Hermann's acceptance of responsibility, his history and characteristics, mental health issues he struggles with and has -- were significant enough to affect -- affect him. Even while he was incarcerated, he had a psychotic break. He's had a number of those. And I believe that those characteristics played a role

in what happened in this case. A sentence that imposes a significant punishment but also focuses on treatment and rehabilitation is what we're asking the Court to consider. Both the Court and the prosecution have sort of gotten into the details into the weeds and what those text messages were between Mr. Hermann and the young lady in question. I'm not going to do that. I know the Court has read them and can put them in their proper context. It's our position taken in the sentencing memorandum that they don't support predatory narrative, but they more support a relationship that they both knew was wrong and that they both took measures to engage in and to avoid detection of. And I think those relevance -- those factors are also relevant. I would also ask the Court to consider, and I know the Court will, the numerous letters of support filed herein. Mr. Hermann has a strong support system that will continue to exist when he's finished being incarcerated, whenever that happens. And he is going to have that support system behind him when he gets out. They're going to take care of him. He also has a history of great success, specifically athletically that shows that he has the discipline and the character necessary to abide by the Court's

rules and to follow through with the Court's expectations on supervised release. We would acknowledge we have gone over those conditions. We don't have any objection to them. We have signed a notice to that effect and filed them with the Court.

I would also note that we are asking the Court to consider placement and recommendation to FCI Seagoville and the programs of welding and auto mechanic for vocational.

Mr. Hermann acknowledges the hurt that he's caused to the victim in this case and to her family. He's deeply sorry for what he's done and his role in causing that damage. And I would ask the Court to also consider that there are some lifetime consequences here. Sex offender registration that will be for life that will follow this conviction. And I know Mr. Hermann would like to address the Court, and that is I believe all I have.

THE COURT: Thank you, Mr. Sloan. The Court will give appropriate weight to your argument. And at the appropriate time, I may respond to a couple of those points, but I don't want to delay Mr. Hermann's opportunity to allocute.

So Mr. Hermann, you have an absolute right

to allocute at federal sentencing. Allocution simply means you can tell the Court information you think is relevant to the sentencing decision. You can read aloud a prepared written statement. You can make arguments for the Court to consider. You can present information you think is relevant to your case. There is no limit to what you can tell the Court through an allocution, but it is also true that you can never be forced to allocute. Is there anything you would tell the Court at this time in the form of an allocution?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. And you can do so seated or standing, whatever is most comfortable.

THE DEFENDANT: Your Honor, I just want to start with saying thank you for allowing me to speak, and I apologize for wasting your time with this.

My whole life, I've worked really, really, really hard to make a name for myself, and I think that I did pretty well in doing that. And then all it took was one -- one mistake to completely ruin that. At the end of the day, all a person really has is their name, and mine will forever be ruined. And that's my fault. Those are from my actions, and

I will never disagree with that. I -- I want to apologize for my actions, specifically to "J" and her parents and her extended family. I know that no words that I can say will ever fix or amend anything that they'll have to go through, but -- from the bottom of my heart, I am horribly, horribly sorry. It was never my intention to have this kind of impact. It was never that way. And that's something that I'm going to have to live with for the rest of my life and I already do. For the past 13 months, there hasn't been a single night that I haven't woken up in a cold sweat from some nightmare involving this situation.

I pray almost every day, every night that -- that she is able to find peace and to move on and have a successful life.

Your Honor, I think beside that point, I would like to also apologize to my family. A lot of them share the same name and now their name is tainted as well. I want to also thank them for being here. I really -- I feel like I just let everybody down. A lot of people looked up to me. Like I said before, I made a name for myself, especially in the wrestling world. And again, it's just tainted. I let so many people down, and I

don't know how to fix that, your Honor. Thank you.

THE COURT: Is there anything further that you would tell the Court in the form of an allocution?

THE DEFENDANT: No, your Honor.

THE COURT: Okay. The Court will give appropriate weight to your allocution. I do want to briefly respond to some arguments made by defense counsel just so that the Fifth Circuit has a clear and clean record. I think Mr. Sloan made reference to rehabilitation and some of the recommendations that occur in a very separate and independent phase of sentencing. The Supreme Court instructed in *Tapia versus United States*, 564 U.S. 319, that this Court can never increase the length of a sentence for purposes of rehabilitation. So whatever this Court does in a separate phase vis-a-vis rehabilitation would be considered separate from the weighting of the 3553(a) factors. I just want to make sure that the record reflects that the Court knows *Tapia* and that distinction and those are different parts of the sentencing calculation. So at an appropriate and separate interval, the Court will give Mr. Sloan the widest possible latitude to request recommendations for continued care,

education, and treatment, but that is separate and independent of the Court's weighting of the 3553(a) factors. And the Court must mind that blood/brain barrier under *Tapia*.

Now, with that, Mr. Sloan, do you know of any reason why this Court may not lawfully impose sentence?

MR. SLOAN: No, your Honor.

THE COURT: Any reason known to the Government?

MS. WOOLAM: No, your Honor.

THE COURT: Having considered the permissible factors 18 U.S.C. Section 3553(a), the advisory sentencing guidelines, the conduct admitted in the factual resume and all mitigating and aggravating factors, it is the judgment of this Court that the Defendant, Nicholas Jade Hermann, is hereby committed to the custody of the Federal Bureau of Prisons for a period of 216 months. This represents a downward variance from the applicable and final advisory guidelines range for the reasons stated during this Court's adjudication of Defendant's motion in document number 55. The Court finds Defendant has no resources or future earning capacity to pay a fine based on PSR paragraph 85

which reported no income but significant liabilities. Accordingly, this Court does not order a fine in this case because Defendant does not have the resources or future earning capacity to pay a fine.

The Court does not order the Defendant to pay the Justice for Victims of Trafficking Assessment Act because Defendant does not have the financial resources or future earning capacity to pay an assessment. Defendant is indigent for purposes of the JVTA and cannot pay the assessment in addition to the one hundred dollar special assessment which will be imposed.

The Court's determination at all times was guided by *United States versus Graves*, 908 F.3d 137, Fifth Circuit case from 2018. And that describes in greater detail the sentencing court's latitude in its determination of indigency.

Additionally, the plea agreement in this case did not refer to a JVTA assessment which further supports the Court's determination. And the Court notes that there was a recent lapse of the JVTA which makes it -- it's retroactive application suspect where the offense conduct occurred prior to its re-enactment. PSR paragraph 95 describes the

recent lapse in the JVTA statute.

Ms. Woolam, is it the Government's position that that lapse does not affect the applicability of a JVTA assessment in this case?

MS. WOOLAM: Yes, that's correct, your Honor.

THE COURT: Any response from the Defendant?

MR. SLOAN: Your Honor, it's our position because -- we agree with the Court because it's not in the plea agreement that he didn't have notice of it, and also I think his indigency moots the question.

THE COURT: Okay. So here, the Court agrees with defense counsel this was not included as part of the plea agreement and thus not part of the Rule 11 plea colloquy. And for that and other reasons stated at the sentencing hearing, the Court is not imposing the JVTA assessment. And the Court does find Defendant indigent under the relevant authorities and as guided by *United States versus Graves*, 908 F.3d 137. But the Court does order the one-time mandatory special assessment of one hundred dollars which is due and payable immediately.

The Court does not order restitution

because while the Title 18 offense of conviction mandates restitution, no restitution claims have been entered as of this date.

Now, having made the required individualized determination and presided over the sentencing hearing and observed the Defendant, his allocution and all the arguments before the Court as well as the relevant guideline sections specific to supervised release, the Court further orders that upon release from imprisonment, Defendant shall be placed on supervised release for a term of 25 years. While on supervised release, Defendant shall comply with the mandatory conditions listed at Section 3583(d) and Section 5D1.3(a), the standard conditions listed in Section 5D1.3 and the following discretionary and special conditions which are derived from Section 5D1.3(b)(1) and (3). And the Court deems these reasonably related to the Section 3553(a) sentencing factors.

The Court has ruled that the JVTA assessment may not be applied here and will not be applied here. I have stricken from the relevant notice discretionary and special condition 12 and 13 which will not be made part of the pronouncement and will not be applied here. I've created a

handwritten notation to that notice. It would be made part of the record signed by the Court. I'll just ask that Defendant, defense counsel and the AUSA in this case enter their initials signifying that you received notice of that. And that that is modified by the pronouncement. As counsel know, it's binding Fifth Circuit precedent that oral pronouncement control, but I wanted to make sure that the written notice was conformed to that pronouncement. Both counsel for Defendant and the Government have indicated their understanding by affixing their initials as well as Defendant.

So now, the Court will pronounce the discretionary and special conditions which are derived from Section 5D1.3(b)(1) and (3), and these, as pronounced by the Court, are deemed reasonably related to the 3553(a) factors. First, number one, the Defendant shall not have contact with persons under the age of 18, except when directly supervised by an adult who's approved in advance by the probation officer, nor shall Defendant loiter near places where children may frequently congregate. The Defendant shall neither seek nor maintain employment or volunteer work at any location where persons under the age of 18 congregate, and the

Defendant shall not date or intentionally develop a personal relationship with anyone who has children under the age of 18 without prior permission from the probation officer.

Number two, the Defendant shall have no contact with the victims or the victim's family directly or indirectly without prior approval by the probation officer.

Number three, the Defendant must allow the probation officer to installing computer monitoring software on any computer as defined in 18 U.S.C. Section 1030(e)(1) the Defendant uses.

Number four, to ensure compliance with the computer monitoring condition, the Defendant must allow the probation officer to conduct initial and periodic unannounced searches of any computers as defined in 18 U.S.C. Section 1030(e)(1), subject to computer monitoring. These searches shall be conducted for the purposes of determining whether the computer contains any prohibited data prior to installation of the monitoring software, to determine whether the monitoring software is functioning effectively after its installation and to determine whether there have been attempts to circumvent the monitoring software after its

installation. The Defendant must warn any other people who use these computers that the computers may be subject to searches pursuant to this condition.

Number five, the Defendant shall not use any software program or device designed to hide, alter or delete records and/or logs of the Defendant's computer use, internet activities or files stored on the Defendant's computer or cellular phone.

Number six, the Defendant shall not possess, have access to or utilize a computer or internet connection device including but not limited to Xbox, PlayStation, Nintendo or similar device without permission of the probation officer. This condition requires preapproval for categories of computer or internet access or use. It does not require separate pre-use approval every time Defendant accesses or uses a computer or the internet.

Number seven, without prior approval of the probation officer, the Defendant shall not maintain or create a user account or any social networking cite; that is, Facebook, Twitter, Snapchat, Instagram, Grindr, Tinder, et cetera, that

allows access to persons under the age of 18 or allows for the exchange of sexually explicit material, chat conversations or instant messaging. The Defendant shall neither view nor access any web profile of persons under the age of 18.

Number eight, the Defendant shall not engage in or utilize any service that allows peer-to-peer file sharing or file transfer protocol activity.

Number nine, the Defendant shall neither possess nor have under his control any sexually oriented or sexually stimulating materials for adults or children. I should say of adults or children. The Defendant shall not patronize any place where such material is available.

Number ten, the Defendant shall participate in sex offender treatment services as directed by the probation officer until successfully discharged. These services may include psychophysiological testing; i.e., clinical polygraph, plethysmograph and the ABEL screen to monitor Defendant's compliance, treatment, progress and risk to the community. The Defendant shall contribute to the costs of services rendered copayment at a rate of at least $20 per month.

Number 11, the Defendant shall participate in outpatient mental health services as directed by the probation officer until successfully discharged. These services may include medications prescribed by a licensed physician. The Defendant shall contribute to the costs of services rendered copayment at a rate of at least $10 per month.

The Court by handwritten notation and the assent of the parties has stricken special and discretionary conditions 12 and 13.

And the final and 14th special and discretionary condition is as follows: The Defendant must provide the probation officer with access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the U.S. Attorney's Office.

Mr. Sloan, did you and your client receive a timely copy of the written notice of intent to impose conditions of supervised release?

MR. SLOAN: We did, your Honor.

THE COURT: Did you have full and complete opportunity to review that that notice with your client?

MR. SLOAN: We did, your Honor.

THE COURT: And turning to the standard conditions appearing on written pages three and four of that notice, does Defendant have any objections to those standard conditions?

MR. SLOAN: No, your Honor.

THE COURT: As modified by the Court's handwritten notation and noted by various signature blocks, does Defendant have any objections to the discretionary and special conditions appearing on written pages four, five, and six and pronounced orally by the Court?

MR. SLOAN: Your Honor, I believe it was special condition 14 required the Defendant to inform both the prosecutor and the district attorney's office about his financial situation. As the financial obligations have been stricken from the conditions, I don't know that that condition's necessary. Other than that, I don't have any issues with any of them.

THE COURT: A response from the Government?

MS. WOOLAM: Your Honor, I agree that there is no financial condition other than the special assessment that would be at play here, so we would defer to the Court on that. That condition

may not be necessary in light of it, but we would defer to the Court.

THE COURT: Okay. So the special assessment which is mandatory does remain in place. Defendant does need to satisfy that requirement. That is one hundred dollars and it is a one-time payment. The Court by handwritten notation and strike is removing discretionary and special condition number 14 as it appeared on written page six of the notice and as it was pronounced.

May I assume, Mr. Sloan, that your signature in handwritten form applies with equal force to that discretionary and special condition number 14?

MR. SLOAN: Yes, your Honor, as well as that of Mr. Hermann.

THE COURT: And Ms. Woolam; is that true also for the Government?

MS. WOOLAM: Yes, your Honor.

THE COURT: So we don't need to re-sign the document twice?

MS. WOOLAM: Correct, your Honor.

MR. SLOAN: Correct, your Honor.

THE COURT: And does defense counsel agree that this Court has adequately modified the oral

pronouncement on the record as part of the transcript such that the oral pronouncement does not conflict with the written judgment or the notice that occurred prior to the sentencing hearing?

MR. SLOAN: Yes, your Honor.

THE COURT: And does the Government agree?

MS. WOOLAM: Yes, your Honor.

THE COURT: Okay. So the Court so finds. And for further appellate review, this Court conformed the oral pronouncement such that special and discretionary condition number 14 is -- does not apply and is not orally pronounced to Defendant.

And Mr. Hermann, do you agree to abide by, adhere to and to follow the conditions of supervised release stated in this written notice and pronounced orally?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. The Court has fully reviewed and now modified by handwritten notation the notice. It is dated June 23rd, 2026. It bears the signature of the Defendant, defense counsel and this Court. It is made a part of the record in this case and in any record on appeal. The notice and conditions of supervised release stated therein and modified by handwritten notation and oral

pronouncement are hereby adopted, ordered and imposed as pronounced by the Court.

The Court will now enter its statement of reasons. Here, the Defendant's guideline sentencing range exceeded 24 months, so the Court will state with particularity its reason for imposing sentence within a particular point within that range as required by 18 U.S.C. Section 3553(c)(1). Here, the sentence is sufficient but not greater than necessary to comply with the statutory purposes set forth at 18 U.S.C. Section 3553(a). Here, the Court incorporates by reference its balancing of the 3553(a) factors in adjudicating Defendant's Motion for Downward Variance and final arguments. The Court imposed sentence for the same reasons previously given and stated in its adjudication of that Motion for Downward Variance and also in response to arguments of counsel.

And the Court further finds that Defendant's final argument that this Court must avoid a 3553(a)(6) unwarranted sentencing disparity by reference to state penalties is inconsistent with the plain text of 3553(a)(6) which refers to the need to avoid unwarranted sentencing disparities among defendants who have been found guilty of

similar conduct but only unwarranted disparities between similarly situated defendants nationwide. Additionally, the Supreme Court has explained that Defendant's mere disagreement with the Court's weighting of the Section 3553(a) factors is insufficient to establish that the sentence is substantively unreasonable. The Court so held in *Gall versus United States*, 552 U.S. 38.

And again, you have this Court's ruling on 3553(a)(6) from earlier in the hearing. That's made part of the record as well and part of the statement of reasons.

Now, on supervised release, the Court made the required individualized assessment and imposed a 25-year term of supervised release for added deterrence and protection. At all times, the Court was guided by Guideline Section 5D1.1 and the associated commentary. This Court ordered and imposed a lengthy term of supervised release for reasons that echo in the statement of reasons.

The Court also considered Defendant's demonstrated willingness to approach minors for satiation of his own sexual desires, and this lengthy term of supervised release is meant in part to account for that individualized assessment.

The Court imposed the standard conditions of supervised release under Section 5D1.3(b)(2) without revision or amendment because the individualized assessment reflected that no revision or amendment were appropriate to this Defendant in this case.

In light of the Fifth Circuit's opinion in *Diggles* and similar cases, the Court adopted, ordered and imposed the discretionary conditions because they are consistent with 3583(d)(1), (d)(2) and (d)(3). And the Court expressly states that those discretionary conditions involve no greater deprivation of liberty than reasonably necessary consistent with 3553(a)(2)(B), (a)(2)(C) and (a)(2)(D).

The Court in part imposed discretionary conditions to account for Defendant's demonstrated willingness to approach minors for purposes of sexual gratification and that in part explains the individualized assessment that a lengthy term of supervised release was necessary.

The Court has entered its statement of sentence. Does Defendant have any objections to the statement?

MR. SLOAN: No, your Honor.

THE COURT: Any objections from the Government?

MS. WOOLAM: No, your Honor.

THE COURT: The Court hereby orders the sentence imposed as stated. Finally, and emphatically, because this was a complicated case with numerous objections requiring adjudication and also a motion for variance that required considered weighting of the 3553(a) factors, the Court states emphatically and expressly that even if it erred in calculating the advisory guidelines range, this Court would have imposed the exact same sentence for the exact same reasons stated during the sentencing hearing, regardless and irrespective of the applicable advisory guidelines range. Stated with even greater emphasis, even had the Court erred in any of its rulings on Defendant's objections or its adjudication of the motion for variance and various arguments relevant to the sentencing range, this Court would have used the tool of variance to arrive at the exact same result under its sentencing discretion to do so; 216 months' imprisonment followed by a 25-year term of supervised release.

Now, Mr. Sloan, as you know, and Ms. Woolam, as you know as well, we have now reached

that separate and independent part of the sentencing hearing where I will take recommendations on Defendant's medical care, vocational training and residential placement.

So given Defendant's medical history, I'm inclined to order a full medical evaluation. I know that there are orthopaedic issues relating to his years of wrestling. Also, Defendant has reported extreme mental health conditions ranging from anxiety to depression to hallucinations and psychotic episodes.

Mr. Sloan, I know sometimes defendants object to pharmacological intervention if they have ever struggled with substance abuse. Any objection to a mental health recommendation that might include medications?

MR. SLOAN: No, your Honor.

THE COURT: And do you have any additional mental health or substance abuse recommendations or requests?

MR. SLOAN: No, your Honor.

THE COURT: Okay. Any objections, Ms. Woolam?

MS. WOOLAM: No, your Honor.

THE COURT: The Court does recommend that

the Defendant be allowed to participate in a full medical evaluation conducted by the Bureau of Prisons to address the myriad health conditions listed in PSR paragraph 61 through 72, to include attention to back pain or injuries, vision problems, knee problems and other orthopaedic conditions.

And the Court emphatically recommends the most intensive mental health treatment deemed consistent with his security classification and qualification of Defendant, to include pharmacological interventions and medications, if prescribed and monitored by a licensed physician or psychiatrist, M.D. or Ph.D.

On vocational training, this is the rare case where the Defendant graduated from an elite institution sometimes referred to as a Public Ivy. I'm assuming continued education is a requested recommendation at the collegiate or higher level?

MR. SLOAN: Yes, your Honor.

THE COURT: And are there any specific courses or coursework that you would request?

MR. SLOAN: Apart from general collegiate advancement, Mr. Hermann has also expressed an interest in some vocational training as welding and auto mechanic. So we would ask that the

recommendation for -- participation in those programs be included.

THE COURT: Okay. Any objection, Ms. Woolam?

MS. WOOLAM: No, your Honor.

THE COURT: This Court finds that the Defendant is overqualified for additional education and training to include upper-level collegiate coursework but also vocational training in the fields of welding and mechanics as reflected in PSR paragraph 74.

Now, Mr. Sloan, I know from the character statements and the outpouring of support manifest in the gallery today that Defendant has a network of friends and family who are important to him. Is that the priority for the residential recommendation, or are you still asking for FCI Seagoville?

MR. SLOAN: Your Honor, I'm asking for FCI Seagoville for reasons of personal safety.

THE COURT: And the nature of the offense?

MR. SLOAN: That's right. I believe it's also close to his relatives, so.

THE COURT: Okay. Does the Government agree that FCI Seagoville is the best recommendation

for Defendant's custody and care?

MS. WOOLAM: Yes, your Honor.

THE COURT: Okay. So because of the sex offender separation and treatment facilities and resources at FCI Seagoville, the Court does recommend that facility for this term of incarceration.

Now, I believe this is a one-count Indictment with no pending charges to dismiss; is that correct?

MS. WOOLAM: That's correct, your Honor.

THE COURT: Thank you for that clarification.

Now, so let's discuss remaining rights of appeal. Mr. Hermann, if you decide to pursue an appeal, your notice of appeal must be filed with this Court within 14 days of the date judgment is entered in your case or within 14 days of the Government entering its notice of appeal. Also, and importantly, if you decide to pursue that appeal, you have an absolute right to apply for leave to proceed in forma pauperis. So this is sometimes abbreviated IFP. If IFP status is granted, you may be allowed to pursue that appeal at no cost to yourself but instead at a cost to the Government.

Mr. Sloan, did you and your client receive a timely copy of the notice of right to appeal?

MR. SLOAN: We did, your Honor, and I -- this may not be timely, but in furtherance of that right, I do wish to object to the sentence imposed as substantively unreasonable for the reasons that were outlined in the objection and the Court's rulings to those. Just for the purposes of preservation for appeal -- I recognize the Court's going to overrule that objection, but I wanted to at least put that on the record.

THE COURT: Okay.

MR. SLOAN: We have gone over the rights of appeal. I've gone over those with Mr. Hermann. He understands. And we signed it.

THE COURT: Okay. So I'll carry forward that objection to substantive unreasonableness, but at this time, I need to confirm that you explained to Defendant the 14-day period that applies to the notice of appeal?

MR. SLOAN: I did, your Honor.

THE COURT: And does Defendant have any other objections to the appellate rights arising under the plea agreement including the appellate waiver?

MR. SLOAN: No, your Honor.

THE COURT: And does Defendant have any objection to the appellate rights described in this notice of right to appeal?

MR. SLOAN: No, your Honor.

THE COURT: Okay. Ms. Woolam, did the Government receive a timely copy of that notice of right to appeal?

MS. WOOLAM: Yes, your Honor.

THE COURT: Any objections?

MS. WOOLAM: No, your Honor.

THE COURT: And if you will, please respond to the substantive unreasonableness argument by Mr. Sloan so that the Fifth Circuit can have a complete record.

MS. WOOLAM: Yes, your Honor. We've discussed many of the factors of this case thoroughly both with regard to the objections and the Motion for Downward Variance and just argument on sentence.

This Court already gave a very favorable sentence to this Defendant in light of what the advisory guideline range which was 235 to -- to 293. The Court downward varied to 216 months and laid out a very, very thorough and good basis for doing so,

including the JSIN information of other similar cases' sentences throughout the country. For those reasons, we believe that this sentence is not substantively unreasonable. It's a reasonable sentence in light of all of the facts and circumstances and all of the 3553(a) factors.

THE COURT: And Mr. Sloan, a sentence is substantively unreasonable if it ignores a factor that should have been given considerable weight, gives considerable weight to an improper factor or as the result of a, quote, clear error of judgment in balancing the sentencing factors. That's a direct quote from *United States versus Chandler*, 732 F.3d 434, a Fifth Circuit case from 2013. I could cite seriatim other cases to that effect. What particular factor would you highlight in urging that substantive unreasonableness argument?

MR. SLOAN: I would argue two factors; the Court's ruling on undue influence and then also the Court's ruling that state sentences -- that the state sentencings for improper relationship under 21.12 don't reflect -- aren't similar offenses under 3553(a)(6).

THE COURT: Okay. So I know those two categories because we had a lengthy colloquy on

both.

MR. SLOAN: Right.

THE COURT: Which of the three substantive unreasonable categories would you place those pegs into so that I don't have a --

MR. SLOAN: If I'm -- which ones are the --

THE COURT: Yeah, so let's begin with the first one which is the undue -- the ruling on undue influence enhancement. So would you consider that sounding and giving -- ignoring a factor that should have been given weight?

MR. SLOAN: Ignoring a factor that should have been given weight is where I would put that one. And then the other -- I think the Court erred in not considering state sentencing practices in connection with 3553(a)(6).

THE COURT: And would you categorize that as the result of a clear error of judgment in balancing sentencing factors?

MR. SLOAN: Yes.

THE COURT: Okay. So weighted accordingly and placed in the proper taxonomy, the Court overrules Defendant's objection to substantive unreasonableness. Fifth Circuit has held in *United*

*States versus Waguespack*, 935 F.3d 322, a Fifth Circuit case from 2019, that a weighting of 3553(a)(6) is not substantively unreasonable or sounding in unreasonableness when the sentence is in fact below the guidelines.

Additionally, regarding undue influence, the Fifth Circuit has the Court's dutiful adjudication of that objection. And that ruling is further supported here by Defendant controlling victim's weight as a function of the wrestling curriculum and other physical activities that made Defendant a vulnerable victim.

So both of my sisters played college soccer; one of them at Baylor, one of them at Texas A&M. Both won Big 12 Championships. I know the pressures that are placed on college athletes, and I do understand that weight is a function of class within wrestling. But in addition to the Court's prior arguments and rulings on undue influence, the Court finds that a coach who is controlling the physicality and even the weight of a vulnerable female athlete certainly qualifies for the enhancement, and the Court supplements its adjudication of that 2G1.3(b)(2)(B) enhancement to include that additional factor.

Objection number two was overruled for the reasons previously stated, but I would supplement that record to include the unique element of athletics and the additional influence that a coach asserts, especially in a sport where weight and class are so inextricably intertwined.

So Defendant's objections to substantive unreasonableness are overruled for the reasons stated at the sentencing hearing. And I believe that brings us to the end of that analysis.

And I don't hear, Mr. Sloan, any objection that the sentence is procedurally unreasonable; is that correct?

MR. SLOAN: That's correct, your Honor.

THE COURT: Okay. Understood. With that, is there anything further from the Government?

MS. WOOLAM: No, your Honor.

THE COURT: Anything further from the Defendant?

MR. SLOAN: One tiny item to correct on the record. The Court referenced an appellate waiver. There's no appellate waiver in this case. And sic 'em, Bears.

THE COURT: Oh. Well, you can go and visit a plaque that has my sister's name on it right

there at the soccer field. So she won your university's first Big 12 Championship. Not just her. There's a bunch of other soccer player. But okay. So sic 'em Bears then.

Yes, you are correct. And to the extent the Court mistakenly referred to an appellate waiver, there is not one in this case, and the notice of right to appeal did not include the standard language specific to that waiver I don't believe. Yes, that's correct. So here, there is no appellate waiver, and the Court at all times was understanding of this reality. Anything else, Mr. Sloan?

MR. SLOAN: No, your Honor.

THE COURT: Okay. Mr. Hermann, I know that this is a lengthy and daunting sentence, and your attorney made reference to the fact that over 30 people in the courtroom showed up to support you, and he said that's unusual but not unheard of, for many people to come to a federal sentencing. That is true and untrue. It is true that most defendants don't have a gallery filled with people supporting them. But sadly, it's untrue in this community.

This Court has now presided over four to five hearings involving sexual crimes of this

nature. And almost like a wedding, the community picks sides in the courtroom. Bride, groom. Defendant, victim. And the outpouring of support is almost always for the perpetrator and the Defendant, not the victim.

Today, the minor victim's mother has stood alone and sat alone on her side of the gallery as you amassed an array of community support rallying to your cause, even though you are the Defendant in this case. You were the one that took advantage of a minor girl.

You were the one who in many ways minimized your conduct during your allocution. You were very close to reversing this Court's order on downward variance as a result of that allocution. I'm not going to do that here because this Court has already dutifully balanced the 3553(a) factors, but there's really only one person that feels alone through all of this. It's the victim and the victim's mother and family. And I want to be clear on the record this Court's disgust at the fact that she stood alone and the mother stood alone while notable and important people in our community rallied to your side. So that is the asymmetry and the reality of this case. So please let that weigh

on you.

You are remanded into the custody of the United States Marshal. We are adjourned. Counsel are excused.

[PROCEEDINGS CONCLUDED AT 3:50 P.M.]

* * * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

/s/ Christine M. Orr, RPR, 8-17-26
Official Court Reporter Date